UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Elite International Enterprise, Inc.,

        Plaintiff/Counter-Defendant,

v.

Patton Wallcoverings, Inc. and Norwall
Group, Inc.,

        Defendants/Counter-Plaintiffs.

_____/

Case No. 12-14620

Honorable Nancy G. Edmunds

## OPINION AND ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [27 & 30]

Currently before the Court are Plaintiff Elite International Enterprise's motion for partial summary judgment and Defendants Patton Wallcoverings' and Norwall Group's motion for summary judgment. For the reasons set forth below, the Court DENIES IN PART and GRANTS IN PART Plaintiff's motion, and DENIES IN PART and GRANTS IN PART Defendants' motion.

**I.    FACTS**

Plaintiff Elite International Enterprise is a Michigan based company that specializes in selling wall paper in the Middle East. Mr. Rami Kseri is Plaintiff's owner, operator, and sole employee. Defendant Patton Wallcoverings is an Ohio based manufacturer of wallpaper.[1]

_____

[1] Patton purchased Co-Defendant Norwall Group, a Canadian wallpaper company, several years prior to the filing of this lawsuit, however, Patton continues to produce wallpaper under the Norwall brand name. For the purposes of this case, the Court will use

After conducting business for a number of years indirectly by way of a contract with Mr. Kseri's father, Patton and Elite entered into a direct business relationship. Defs.' Mot. Summ. J. 2. From the outset, whether through his father's firm or Elite, the core of the relationship involved Mr. Kseri selling Patton's products in the Middle East. In 2011, during a time when the parties did not have a current written agreement, Elite indicated that it would need documentation to show to customs agents in order to properly import Patton's products to the Middle East due to a change in the location of Patton's factory. Kseri Dep. 25:10-16:27:6, November 20, 2013. The written document that was produced as a result of Elite's need for documentation is the contract at the core of the present dispute between Elite and Patton. *Id.* at 27:7-29:15. Elite contends that the need for shipping documentation was not the main reason for the creation of the contract. *Id.* at 25:10-15.

The operative contractual language at issue is[2]:

> Whereas, EIE is the permanent and sole exclusive agent for all wall covering Products on behalf of PWNGI for export and sale within the Sales Territory as set out below, hereinafter referred to as the "Sales Territory" and
>
> Whereas, PWNGI agrees to appoint EIE its distributor for the Sales Territory as defined herein and under the terms and conditions hereinafter set forth;
>
> \* \* \*
>
> 3. <u>Product</u>
> For the purposes of this Agreement, the term "Products" shall mean those products manufactured in South Korea by DID Wall coverings [sic] Co., Ltd,

---

the term "Patton" to refer to both Patton and Norwall Group.

[2] For the purposes of the contract, the abbreviation "EIE" and "PWNGI" are accepted to mean Plaintiff, Elite International Enterprise, and Defendants Patton Wallcoverings and Norwall Group, respectively.

13F Gungdo Bldg #278-19, Nonhyun-dong, Gangnam-gu, Seoul, Korea on behalf og PWNGI.

Defs.' Mot. Summ. J. Ex. B.

The contract appointing Elite as Patton's distributor and sole exclusive agent in the Middle East was to be effective March 1, 2011 through February 28, 2014. *Id.*

By 2011, Mr. Kseri had been selling Patton products in the Middle East for four years. Kseri Dep. 32:6-10. However, Elite was only placing orders for a fraction of Patton's available product lines. *Id.* at 129:1-8. Elite contends that those were the only product lines that its customers were interested in, in light of the fact that Patton had not released any new product lines in several years, instead releasing new combinations of old products. *Id.* at 150:5-154:21. Elite further contends that its customers expressed interest in new and different product lines. *Id.* Patton claims that Elite made the decision to limit its purchases on its own, without regard to what its clients may or may not have wanted. Patton also claims that it did introduce new product lines every year. Defs.' Br. in Resp. to Pl.'s Mot. Summ. J., Ex. C, Patton Decl. at ¶¶ 18-19.

There is no dispute that on August 25, 2011, James Patton, the CEO of Patton Wallcoverings sent Mr. Kseri an email with the following language:

> As you know. your sales and distribution with Norwall Group expired on 3/31/2010. This email will serve as notification to you and Elite Inc. that Patton Wallcovering / Norwall Group will not be offering you any new products for distribution nor create any new custom books, effective immediately. This includes the Cheeky Monkey and Black & White 2 catalogs that will be introduced in the near future. However. Patton Wallcovering will continue to service Elite on all product presently represented by Elite until these catalogs are discontinued. Pricing of products from Patton Wallcovering to Elite presently in place will remain in effect through 12/31/11. Pricing starting in 2012 will be reviewed and if necessary adjusted, based on raw material cost increases. Additionally, your

3

> payment terms of 30 days will be extended to 45 days and we will continue
> to service your account as stated above as long as payment terms are met.

Defs.' Mot. Summ. J., Ex. H., August 25, 2011 email from James Patton to Rami Kseri.

The parties are also in agreement that Mr. Patton followed through on the statements made in the August 25th email. Specifically, Elite was not provided access to any custom books or new product lines made available by Patton after August 25, 2011.

Additionally, there is no dispute that after sending the above email, Patton began selling its wall coverings directly in the Middle East through distributors other than Elite. Defs.' Br. in Resp. to Pl.'s Mot. Summ. J., Ex. C, Patton Decl. at ¶ 21.

Elite claims that Patton breached it duties under the contract by selling directly in the Middle East and by using other distributors in the region, namely Asio African, an Egyptian distributor that Elite claims it spent considerable time and effort setting up and installing in the region.[3] Elite also claims that Patton unilaterally "terminated" the contract and that Patton's decision to limit Elite's access to older product lines is also a breach of the contract. Furthermore, Elite alleges that Patton is liable for damages suffered due to Patton's provision of defective products over the course of the contract.

Elite has submitted as evidence a "damages chart." The chart appears to be a historical breakdown of Elite's sales on a country-by-country and product-by-product basis for 2011 through the second quarter of 2013. Defs.' Mot. Summ. J., Ex. O. The information therein, however, does not contain dates of transactions or indications of which orders

---

[3] Elite later sued Asio African upon discovering that Asio African and Patton were dealing directly with each other. The Elite/Asio African business relationship has soured, and Asio African refuses to work with Mr. Kseri. Elite withdrew the lawsuit against Asio African.

4

contained defective products or instances where Elite incurred extra costs associated with replacing the defective goods.

Finally, the parties do not dispute that Elite's sales plummeted after Patton limited Elite's product lines and began using other distributors. Elite attributes this decline in business to Patton's actions, while Patton suggests that there are any number of reasons for the decline, including Mr. Kseri's business practices and the ongoing political unrest in the Middle East in general, and in Egypt in particular.

Elite filed suit in this Court on October 18, 2012. Discovery was scheduled to conclude on October 1, 2013. The parties timely filed the instant motions for summary judgment.

## II.   ANALYSIS

### A.  The Standard on Motion for Summary Judgment

The Sixth Circuit recently reiterated the familiar standard for summary judgment, stating that summary judgment is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be

5

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*,  477 U.S. at 252.

### B. Breach of Contract and Contract Construction Under Michigan Law

This case is before the Court by way of diversity jurisdiction, and as such, this Court must apply the substantive law of Michigan. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Furthermore,  where an issue of state law has not been decided by the Michigan Supreme Court, this Court will determine how Michigan's Supreme Court would decide the issue were it faced with it. The Court will heed the decisions of Michigan's intermediate appellate courts except where the Court is persuaded that the Michigan Supreme Court would not so decide, and the Court may consider applicable dicta of Michigan's highest court. *Pack v. Damon Corp.*, 434 F.3d 810, 818 (6th Cir. 2006).

In Michigan, a successful claim for breach of contract must establish three elements: 1) the existence of a contract; 2) breach of that contract, and; 3) damages. *Hall v. State Farm Mut. Auto. Ins. Co.*, 215 F. App'x 423, 428 (6th Cir. 2007).

The rules of contract construction in Michigan are well settled. First and foremost, the intentions of the parties govern when construing a contract or one of its provisions. *First Nat. Bank of Ypsilanti v. Redford Chevrolet Co.*, 258 N.W. 221, 223 (1935). In discerning the parties' intentions, the Court looks first to the language in the written agreement. *Haywood v. Fowler*, 475 N.W.2d 458, 461 (1991) ("Where the language of a contract is clear and unambiguous, the intent of the parties will be ascertained according to its plain sense and meaning."); *see also Wilkie v. Auto–Owners Ins. Co.*, 664 N.W.2d 776, 787 (2003) ("Well-settled principles of contract interpretation require one to first look to a contract's plain language. If the plain language is clear, there can be only one reasonable

6

interpretation of its meaning and, therefore, only one meaning the parties could reasonabl[y] expect to apply. If the language is ambiguous, longstanding principles of contract law require that the ambiguous provision be construed against the drafter." (citation omitted)). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." *Dillon v. DeNooyer Chevrolet Geo*, 550 N.W.2d 846, 848 (1996). As it is with statutory construction, when construing a contract the Court should "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (2003). "Where the language of the writing is not ambiguous the construction is a question of law for the court 'on a consideration of the entire instrument'" *In re Landwehr's Estate*, 282 N.W. 873, 874 (1938) (quoting *Griffin Mfg. Co. v. Mitshkun*, 207 N.W. 814, 816 (1926)). A contract is unambiguous if it "fairly admits of but one interpretation." *Allstate Ins. Co. v. Goldwater*, 415 N.W.2d 2, 4 (1987). An ambiguity as a matter of law is not necessarily created by mere disagreement among the parties as to the meaning of a contract term. *Steinmetz Elec. Contractors Ass'n v. Local Union No. 58 Int'l Bhd. of Elec. Workers, AFL–CIO*, 517 F.Supp. 428, 432 (E.D.Mich.1981). However, if "the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact." *Port Huron Educ. Ass'n MEA/NEA v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (1996); see also *Klapp*, 663 N.W.2d at 453–54. Where the terms of a contract are ambiguous, the Court must look to extrinsic facts along with the terms of the agreement to determine the parties' intentions. *Klapp*, 663 N.W.2d at 454. Ambiguous contracts generally present questions of fact for trial. *Klapp*, 663 N.W.2d at 453–54.

7

### C. Elite's Motion for Partial Summary Judgment

Elite moves for summary judgment on the issues of contractual liability, and on Patton's counterclaim for breach of contract. Elite's motion, however, makes only cursory reference to the counterclaim and makes no real effort at laying out facts or legal arguments to support its position on that issue. The Sixth Circuit has routinely held that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 576 (6th Cir. 2007) (citing *Meridia Products Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006) and quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997)). Plaintiff's argument, therefore, on the issue of summary judgment on Defendants' counterclaim is deemed waived, and its motion is DENIED as to that issue.

### 1. There is no genuine dispute as to the material fact that Patton breached the contract by unilaterally limiting Elite's access to product lines

As noted above, there is no dispute that Patton's CEO sent Elite's CEO an email detailing Patton's plans to limit the products available for Elite to sell. Nor is there any dispute that Patton followed through with this plan, and left Elite with a limited portfolio of products to sell in the Middle East. In determining whether these undisputed facts amount to a breach as a matter of law, the Court applies the principles laid out above, starting with the plain language of the contract.

Section 3 of the contract specifically states that for the purposes of the contract "the term 'Products' shall mean those products manufactured in South Korea by DID Wall coverings [sic] Co., Ltd,…on behalf of [Patton]." While the section of the contract that defines what products are covered by the contract does not contain any language either

8

limiting or expanding the scope of the definition, a plain reading of the language, together with the other relevant provisions of the contact leads the Court to the conclusion that the parties intended Section 3 to refer to all of Patton's products manufactured by DID in Korea.

First, and most significant, is that the clear language of Section 3 imposes no limits on the phrase "those products manufactured in South Korea by DID Wall coverings [sic] Co., Ltd,…on behalf of [Patton]" beyond the obvious limitation that the contract does not require Patton to make available products produced either outside of South Korea, or by a manufacturer other than DID. It stands to reason, then, that Section 3's definition of "Products" means *all* products produced by DID in South Korea for Patton because it would be unreasonable to read any further limiting provision into that language, as the parties have demonstrated that they were capable of adding limiting language. Moreover, reading a limiting provision into that section would risk rendering the contract illusory, as allowing Patton to unilaterally limit the products available effectively means that Patton has no obligations under the contract.

Additionally, reading Section 3 in conjunction with the provisions of the contract appointing Elite as Patton's Middle Eastern agent and distributor further supports this conclusion. Specifically, the contract appoints Elite the "sole exclusive agent for all wall covering Products on behalf of [Patton] for export and sale" in the Middle East. Taking this language at face value, the only further limitation imposed by the contract on the products that should be available for Elite to sell is that Patton must be exporting and selling those products to the Middle East. In other words, if a product is manufactured by DID in South Korea for Patton, and Patton is planning on exporting and selling that product in the Middle

9

East, that product must be made available to Elite.

The final uncontested fact that supports Elite's argument that Patton breached the contract by limiting the availability of its products is that Patton proceeded to sell and distribute new product lines in the Middle East that were made in South Korea by DID but did not use Elite to do so.

The Court finds, therefore, that there is no genuine dispute as to any material fact on the claim that Patton breached the contract by limiting Elite's ability to sell only older product lines. In light of that finding the Court GRANTS Elite's motion for partial summary judgment on the issue of liability arising from Patton's limiting of product availability.

Additionally, for the reasons set forth in Section D1, below, the Court DENIES Elite's motions for partial summary judgment on the issues of liability arising from Patton's direct sales in the Middle East and Patton's use of other Middle Eastern distributors.

**D.  Patton's Motion for Summary Judgment is Granted in Part and Denied in Part**

Defendants identify eight separate issues in Plaintiff's complaint, and move for summary judgment on all of them.

**1.  Patton did not breach the contract by selling directly in the Middle East or by using other distributors in the region**

Patton notes that Elite alleges a breach of the contract by way of Patton's direct sales to Egyptian distributor Asio African, and by Patton's use of DID Wall Coverings as a distributor in the Middle East. Patton argues that the contract does not prohibit it from making direct sales in the region, nor does it prevent it from having distributors other than Elite. Elite disagrees. Specifically, Elite argues that the contractual language grants it the right to sell Patton products in the Middle East to the exclusion of all others, including

10

Patton itself, and it also argues that it grants Elite an exclusive distributorship. These arguments do not survive scrutiny.

As an initial matter, the Court notes that it appears the parties are in agreement that sales agents and distributors are different things. It further appears that there is no genuine dispute as to the differences between a sales agent and a distributor. Specifically, both parties contend that a sales agent acts as an agent of the supplier in setting up distributors, and that the sales agent does not purchase, store, or sell any products on his own, whereas a distributor purchases the product from the supplier, stores the product, and sells it to the public with a mark up in price. The sales agent makes a profit via commission based on the purchasing activity of the distributors it has set up, and the distributor makes its profit via the re-sale mark up. The agent's commission can take several forms, including what is basically a mark up, where the supplier sells to the agent and the agent re-sells to the distributor, but the agent never really takes possession of the product. In short, an agent is a middleman who facilitates the purchase of products by a distributor from a supplier/manufacturer and makes his profits at that point in the process, where the distributor makes his profit by marking up the price and either selling directly to consumers as a retailer or to retailers as a wholesaler.

Mr. Kseri described how his business operates during his deposition. From Mr. Kseri's description, Elite appears to operate as both a sales agent and a distributor. That is, Mr. Kseri describes looking for individuals interested in setting up a distributorship, and then assisting those individuals in getting the new business up and running, which he did in the case of Asio African, and which is an example of Elite functioning as a sales agent.

11

Mr. Kseri also describes using his father's warehouse in Kuwait as a showroom for Patton products which he was re-selling in his capacity as a distributor.

As to Elite's argument regarding the distributorship, the plain language of the contract contradicts Elite's position. That is, the contract states that Patton appoints Elite as "its distributor for the Sales Territory." There is no mention of exclusivity, and any inference of exclusivity arising from the use of the word "its" as opposed to say "a" or "one" is undercut by the fact that in the previous section of the contract the parties expressly used exclusivity language. If the parties intended for the distributorship to be exclusive, they were capable of making it so by the use of clear language to that effect.

Furthermore, as noted above, Mr. Kseri's own description of how Elite operates includes a description of setting up a distributor other than Elite in the Middle East, specifically, Asio Africa, the Egyptian distributor. Such activity demonstrates an understanding by the parties that the contract does not provide for an exclusive distributorship. Therefore, under the undisputed facts before the Court, the Court finds that Patton did not breach the contract by using other distributors for its products in the Middle East.

Slightly more complicated is the issue of exclusive agency. In effect, Elite argues that the contract granted it an exclusive right to sell as opposed to an exclusive agency. The difference between an exclusive right to sell and an exclusive agency is significant. Specifically, where a principal has granted an exclusive right to sell in a region, the principal itself is restricted from selling or, generally, it must pay commissions to the holder of the exclusive sales right for any sales that it does make in the region. *Roberts Associates, Inc. v. Blazer Int'l Corp.*, 741 F. Supp. 650, 656 (E.D. Mich. 1990). On the other hand, where

12

a principal appoints an exclusive sales agent for a region, the principal is not excluded from selling directly in the region. *Id.*

Elite paints this distinction as "hyper-technical" and claims that there is no evidence to support Patton's position that it did not intend to grant an exclusive right to sell. Elite's argument is wrong.

First, the distinction may be fine, but it is far from "hyper-technical," as "[m]ost jurisdictions distinguish between [the] two types of exclusive representation agreements." *Roberts Associates, Inc.,* 741 F. Supp. at 656 (Citing 3 Am.Jur.2d, Agency, § 268, at 768–69 (1986); Anno., Agent–Commission on Sale By Another, 12 A.L.R.2d 1360, 1379 (1949)). The Court was unable to locate an instance where the Michigan Supreme Court explicitly ruled on this issue one way or the other, but given its widespread acceptance and conceptual soundness, the Court is of the opinion that were it called on to do so, the Michigan Supreme Court would formally adopt the distinction between an exclusive agency and an exclusive right to sell. Furthermore, courts in this District have held that in order to find that a principal has no right to sell its own products, the agreement must say so plainly. *Alexander Associates, Inc. v. FCMP, Inc.*, 10-12355, 2012 WL 1033464 (E.D. Mich. Mar. 27, 2012)(citing *Hardy v. Reynolds & Reynolds Co.*, No. 06–12331, 2007 WL 2713736, at *5 (E.D.Mich. Sept. 17, 2001); *Ladd v. Teichman*, 103 N.W.2d 338, 341 (Mich. 1960); 341 Restatement (Third) of Agency § 8.13 (2006); 3 Am.Jur.2d Agency § 260). Here, the contract does not plainly state that Patton has no right to sell its own products in the Middle East.

Second, Elite argues that Patton has no admissible evidence to support its argument on this point, and directs the Court's attention to an earlier contract between Patton and Mr.

13

Kseri's father's company, KDE, as evidence that Patton is in the practice of appointing exclusive distributors, and that it has done so with him in the past. While the older contract arguably is an example of Patton using an exclusive distributorship in the past, it is not a model of clarity on the subject, as it appoints KDE, as "the distributor" in the region and states, much like the contract at issue, that Patton appoints KDE as "its distributor." Moreover, the KDE contract has no "exclusive agent" provision, it only addresses the issue of the distributorship, and so it is not an effective guidepost as to the parties' intention with respect to the agency issue.

In any event, as noted above, absent a plain statement limiting Patton's right to sell its own products, the Court will not construe the contract to so limit Patton.

Finally, Elite directs the Court's attention to email correspondence between the parties. The email with the most relevant content, however, dates to before the contract at issue, and while it contains a statement that could be construed as indicating an understanding of exclusivity, it does not expressly state as much, nor is it clear whether the discussion therein is about Elite's role as an agent or a distributor. The email evidence, therefore, is not sufficient to carry Elite's claim on this issue.

The Court, therefore, finds that Patton's actions do not amount to a breach of the exclusive agency or the distributorship portions of the contract, and GRANTS Patton's motion for summary judgment on those issues.

### 2.  There is no evidence that Patton terminated the contract

Patton argues that it did not "terminate" the contract as alleged by Elite, and moves for summary judgment on this issue. In so far as Elite argues that the August 25, 2011 email "terminates" the contract, that argument is undermined by the undisputed facts before

14

the Court. Indeed, it is uncontested that Elite placed orders with Patton after the alleged termination, and that Patton honored those orders.

Patton's processing of orders after the August 25, 2011 email all but conclusively establishes that Patton did not intend to terminate the contract, nor did Patton act as if it had terminated it. In fact, after placing a handful of orders shortly after the August 25, 2011 email, Elite admits that it voluntarily stopped placing orders with Patton entirely, and does not allege or offer any evidence to suggest that Patton would not fulfill orders placed subsequently, so long as those orders did not request any new product lines. As to that last condition, Elite has offered evidence that supports the position, discussed above, that Patton's refusal to provide Elite access to the full line of Korean made DID product lines amounts to a breach of the contract. Breach and termination, however, can be distinguished from each other in a case such as this, involving an ongoing business relationship. In other words, it is possible for one party to breach a material provision of the contract without completely terminating the ongoing relationship under the broader terms of the agreement.

Based on the foregoing, the Court finds nothing in the record to support Elite's claim that Patton "terminated" the contract. As such, because there is no genuine dispute as to a material fact on this issue, the Court GRANTS Patton's motion for summary judgment on the issue of termination of the contract.

### 3. Patton breached the contract by limiting Elite's access to products

Patton argues for summary judgment on the issue of breach by way of Patton's limitation of product availability. For the reasons stated above, the Court has found that Patton breached the contract by limiting the product available to Elite while continuing to

15

sell new Korean-made DID manufactured products in the Middle East. Therefore, the Court DENIES Patton's motion for summary judgment on this issue.

### 4. Elite's claims for damages based on Patton's provision of defective products

As a threshold matter, the Court notes that in its First Amended Answer, Patton admits providing defective products in certain cases.

Patton has identified three ways in which Elite seeks damages based on Patton's provision of defective products. Specifically, Elite is claiming: 1 - incidental damages; 2 - consequential damages in the form of lost profits and loss of goodwill, and; 3 - damages arising from an accommodation it made for one of its customers. All of these claims are based on the receipt of defective products from Patton. Elite argues that under Michigan law and the UCC it is entitled to establish such damages by way of Mr. Kseri's testimony. Patton argues that the UCC's provisions on course of dealing and course of performance act to limit or prevent Elite from recovering the above mentioned damages because it never tried to recover such damages in the past.

### a. There is a genuine dispute as to a material fact regarding Elite's consequential damages of lost profit

The Michigan Court of Appeals has clearly stated that "[o]pinion testimony of the owner of a business and other persons familiar with his operation as to the amount of damages he suffered by way of lost profits has been held admissible by this Court." *Uganski v. Little Giant Crane & Shovel, Inc.*, 192 N.W.2d 580, 591 (Mich. App. 1971). Additionally, the Court agrees with Elite that while the UCC's principles of course of dealing and course of performance are applicable in the interpretation of a contract, the use of them to imply a waiver of long established rights absent an express intent by Elite to waive

16

such rights is improper. *Johnson Controls, Inc. v. Jay Indus., Inc.*, 459 F.3d 717, 725 (6th Cir. 2006).

Here the right to damages as a result of the receipt of defective products is well established. *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 615 (1992) (noting that "[u]nder Article 2...the purchaser of defective goods may recover the benefit of the bargain...as well as incidental and consequential damages in a proper case."). Additionally, lost profits are available as consequential damages. *Sullivan Indus., Inc. v. Double Seal Glass Co., Inc.*, 480 N.W.2d 623, 631 (1991) (Noting "[e]xamples of consequential damages include lost profits...."). Finally, the question of lost profits is one of fact. *Uganski*, 192 N.W.2d at 590.

As such, given that Patton has admitted that it did ship defective products to Elite from time to time, the Court finds that there is a genuine dispute as to the material fact of consequential damages in the form of lost profits resulting from those defective shipments, and DENIES Patton's motion on that issue.

### b. There is no evidence supporting Elite's claims of incidental damages

As to the issue of incidental damages, Patton notes that Elite has not offered sufficient evidence in support of its claim to survive summary judgment. The Court agrees. The UCC defines incidental damages as:

> "damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach"

Mich. Comp. Laws § 440.2715.

17

Mr. Kseri, in his deposition, stated that, with regard to defective products, Patton "replaced the rolls, yes, gave a credit for the stuff he doesn't produce anymore, but he never paid as a compensation for the customer for shipping, handling, storage, [or] customs...." Kesri Dep. 110:5-9. While those would be examples of incidental damages, that assertion amounts to the totality of the evidence put forth by Elite on this issue. There is nothing to suggest how many times this was an issue, when it was an issue, or with what clients is was an issue. As such, the trier of fact would be left without any information to guide it to a reasonable conclusion as to an amount of damages. As such, the Court GRANTS Patton's motion for summary judgment on the issue of incidental damages. *Anderson*,  477 U.S. at 252.

### c. Elite has not set forth sufficient evidence regarding its claim for damages resulting from a loss of goodwill

Patton relies on the case of *Agric. Servs. Ass'n, Inc. v. Ferry-Morse Seed Co., Inc.*, 551 F.2d 1057, 1071 (6th Cir. 1977) for the proposition that Elite has not satisfied its burden with regard to the evidentiary showing to make out a claim for loss of goodwill. *Agric. Servs. Ass'n, Inc.* however, is a case concerning the law of Tennessee. This case is governed by the law of Michigan, and as such *Agric. Servs. Ass'n, Inc.* is not wholly applicable.

The Court has been unable to locate a Michigan Supreme Court or Court of Appeals case that squarely lays out the requirements for a loss of goodwill claim. As such, the Court will decide this issue in a way in which the Michigan Supreme Court would likely rule if faced with the same issue.

The Michigan Court of Appeals, has noted that:

18

> consequential damages do not arise within the scope of the immediate
> buyer-seller transaction, but rather stem from losses incurred by the
> nonbreaching party in its dealings, often with third parties, which were a
> proximate result of the breach, and which were reasonably foreseeable by
> the breaching party at the time of contracting.

*Sullivan Indus., Inc.*, 480 N.W.2d at 631 (quoting *Petroleo Brasileiro, SA v. Ameropan Oil Corp.*, 372 F.Supp. 503 (E.D.N.Y.1974)). Loss of goodwill can be said to arise as a proximate result of certain types of breach, as in this case, where the breach is the provision of defective products. It stands to reason that a business that provides its clients with defective products will lose esteem in the eyes of those clients. Additionally, at the time of contracting for a sale of goods, it is reasonably foreseeable that, again as in this case, some of those goods will occasionally be defective. Indeed, as the volume of goods increases, the likelihood of defects appearing in the product stream also increases, eventually to the point of certainty. Furthermore, where the seller knows or has reason to know that the buyer will be re-selling the goods, the occurrence of defective goods reaching the buyer's customers is reasonably foreseeable, as is the resulting loss of goodwill. The Court finds, therefore, that in Michigan, the loss of goodwill is a form of consequential damages.

As to the proof of consequential damages, the Michigan Court of Appeals has stated that:

> [t]he certainty required in the proofs for consequential damages is stated in
> the Official UCC Comment, No. 4, p. 745 to M.C.L.A. s 440.2715
> (Stat.Ann.1964 Rev. s 19.2715, 440):
>
> > '4. The burden of proving the extent of loss incurred by way of
> > consequential damage is on the buyer, but the section on
> > liberal administration of remedies rejects any doctrine of
> > certainty which requires almost mathematical precision in the

19

> proof of loss. Loss may be determined in any manner which is reasonable under the circumstances.'

In the case of Godwin v. Ace Iron & Metal Company (1965), 376 Mich. 360, 368, 137 N.W.2d 151, 156, it is stated:

> "But where injury to some degree is found, we do not preclude recovery for lack of precise proof. We do the best we can with what we have. We do not, 'in the assessment of damages, require a mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable.'"

*Uganski*, 192 N.W.2d at 590.

That being said, Elite has not provided any proof that is "reasonable under the circumstances" that it has suffered any damages as a result of its alleged loss of goodwill. A single instance of correspondence between Elite and a client that received defective products would likely have sufficed. Instead, Elite's damages chart is threadbare, and provides no guidance whatsoever as to what losses may be attributable to what claims. Mr. Kseri makes a claim based on lost sales, but there is nothing connecting the lost sales to Elite's loss of goodwill. The Court is not looking for "mathematical precision," but on the proof currently before the court, attributing any damages to Elite's reputational harm would be mere speculation, and it is well settled that the trier of fact must have more than a "mere scintilla of evidence" on which to base its conclusions. *Anderson*,  477 U.S. at 252. Here, in support of its loss of goodwill claim Elite has not met that evidentiary burden, and as such, the Court GRANTS Patton's motion on the issue of goodwill.

### d.  Elite has offered insufficient proof regarding the "accommodation" for which it seeks damages from Patton

Elite describes making a $192,500 "accommodation" for one of its clients, and attributes this to Patton's supply of defective products. Elite, once again, has failed to offer

20

even the slightest bit of evidence to support this claim for what can arguably be construed as consequential damages. There is nothing in the record other than Mr. Kseri's statements regarding this accommodation. It stands to reason that an expenditure of $192,500 would come with some documentation: receipts, confirmations, dated bank records. Elite provides none of this. Absent that financial information, correspondence between Elite and the client regarding the terms of the accommodation would at least provide a trier of fact with a reasonable place to start considering this issue. As noted, Elite has provided nothing beyond Mr. Kseri's testimony on this issue. As such, the Court GRANTS Patton's motion on the issue of the $192,000 accommodation.

### 5. A portion of Elite's claims as they relate to the Indian market are outside the scope of the contract

The contract is clear on the issue of Elite's status in India, and Elite agrees with Patton's argument on this issue, however there is a disagreement over whether certain products were introduced prior to 2010. The contract limits Elite's representation of Patton's products in India to "collections prior to 2010." Any loss of sales or other damages related to Elite's business dealings in India, therefore, may not flow from the sale of Patton products introduced during and after 2010. Therefore, the Court GRANTS Patton's motion for summary judgment on the issue of damages for the sale in India of Patton products released in and after 2010 including "Cheeky and Monkey" and "Black and White 2."

## III.   CONCLUSION

For the reasons stated above the Court rules as follows:

1.  Elite's motion for summary judgment with respect to Patton's counterclaim, and with respect to Patton's liability for breach by using other distributors and selling

21

directly in the Middle East is DENIED;

2.  Elite's motion for summary judgment with respect to Patton's liability for breach of contract by way of its unilaterally limiting Elite's access to old product lines is GRANTED and the Court finds Patton liable for such breach;

3.  Patton's motion for summary judgment as it relates to its use of distributors other than Elite and its direct sales activity in the Middle East is GRANTED and the Court finds that Patton did not breach the contract by such actions;

4.  Patton's motion for summary judgment on the issue of breach by way of limiting Elite's access to old product lines is DENIED;

5.  Patton's motion for summary judgment on the issue of consequential damages - lost profits is DENIED;

6.  Patton's motion for summary judgment on the issue of incidental damages is GRANTED;

7.  Patton's motion for summary judgment on the issue of consequential damages - loss of goodwill is GRANTED;

8.  Patton's motion for summary judgment on the issue of the $192,500 "accommodation" is GRANTED, and;

9.  Patton's motion for summary judgment on the issue of products introduced in and after 2010 in India is GRANTED, including for the product lines "Cheeky and Monkey" and "Black and White."

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  April 24, 2014

22

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 24, 2014, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol Bethel