UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Elite International Enterprise, Inc.,

    Plaintiff,

v.

Patton Wallcoverings, Inc. and Norwall Group, Inc.,

    Defendants.
    _____/

Case No. 12-14620

Honorable Nancy G. Edmunds

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND AWARD OF DAMAGES

A bench trial was held in this case on the 23rd, 24th, and 25th of July 2014. What follows are the Court's findings of fact and conclusions of law with regard to the issues tried. Additionally, the Court's award of damages to Plaintiff is contained herein.

### I. FINDINGS REGARDING BACKGROUND FACTS

1. James Patton ("Mr. Patton") is president and one of two owners of Defendant Patton Wallcoverings, Inc ("PWI"). Mr. Patton testified that PWI currently owns the rights to the Norwall brand of wallpaper, which was formerly owned by Norwall Group, Inc., the now defunct, former parent company of PWI.[1] PWI sells wallcoverings around the world, most relevantly, in the Middle East. PWI is based in Ohio.

2. Patton sells Norwall brand product, generally in six types: small prints, stripes, damasks, silk textures, kitchens, and large scale designs. Across those types, Patton may have up to thirty collections at a given time. For the purposes of sales, the collections are

---

[1] Unless otherwise indicated, all references to testimony are to the testimony given during the bench trial held from July 23, 2014, through July 25, 2014.

presented in books made up of samples of the wallpaper product. The books are a useful sales tool, for sales made both to the distributor and to the end-use retailer, as they allow for the product to be experienced first-hand, as opposed to only in picture. The books themselves, however, are not a source of more than *de minimis* revenue, as they are often given away or sold at or near cost.

3. Rami Kseri ("Mr. Kseri") is the owner of Plaintiff, Elite International Enterprise, Inc. ("Elite"). Mr. Kseri testified that he has been conducting business with PWI since 2006. Mr. Kseri's contact with PWI was initially as a result of PWI's contract with KDE, a company owned by Mr. Kseri's father. Mr. Kseri travels to the Middle East in support of his sales efforts, but he primarily runs Elite from an office in Michigan.

4. The testimony during the bench trial laid out in great detail the workings of a portion of the wallcoverings industry. As it relates to the parties, PWI was a manufacturer of wallcoverings, however, PWI no longer actually manufactures its own product. Instead, PWI designs and owns the intellectual property behind its lines of wallcoverings, and, through a contractual arrangement, has its product manufactured in South Korea by a company called DID Wallcoverings ("DID").

5. Mr. Kseri's role was to generate sales of PWI product in the Middle East to businesses that then resell the product to consumers. In that sense, Mr. Kseri worked as a distributor and sales agent for PWI. In general, PWI and/or DID sells wallpaper at a price between $7.00 and $8.00 to companies like Elite, which then re-sells the product. Both Mr. Patton and DID's deposed representative claimed to have no knowledge of the pricing at the next steps in the chain of sales in the Middle Eastern market. Mr. Kseri, on the other

hand, claims detailed knowledge of that chain of commerce, which the Court will address in the following section.

6. Mr, Kseri worked to sell PWI products during the course of the contract between PWI and KDE, from March 1, 2007 through April 1, 2010. By May 2009, Mr. Kseri's sales were primarily of the Texture Styles, Simply Silk, and Classic Silk collections, plus Limited Edition Arabella and Limited Edition Chateau, two collections that were custom made for Mr. Kseri by cobbling together various patterns from older collections. Mr. Patton testified that the collections that Mr. Kseri was having success selling were substantially, if not completely, comprised of the texture style of wall covering, as opposed to the kitchen or stripe styles. However, Mr. Kseri did indicate via email that the Damask style was in demand. Ex. 17. The Damask style is not a texture style, per Mr. Patton's own testimony.

7. After the KDE contract terminated in 2010, Mr. Kseri and PWI continued to conduct business in the same manner they had been for the previous few years. After approximately one year, in March 2011, Mr. Kseri, this time through his company, Elite, entered into a three-year agency/distribution contract with PWI. It is that contract that Elite is seeking damages on.

## II. FINDINGS REGARDING THE FACTUAL BASES OF PLAINTIFF'S CLAIMS FOR DAMAGES

Based on the evidence submitted during trial, the Court makes the following findings of fact regarding Elite's lost profit claim:

8. Mr. Kseri implemented a sales and pricing system that had three price points per roll of wallpaper: $13, $15, and $18. Generally speaking, as the size of an order increased, the price-per-roll decreased. The average sales price was $15 per roll.

9. Mr. Patton told Mr. Kseri that the $13-$15-$18 pricing was too high. Mr. Kseri disagreed, and disregarded Mr. Patton's advice on the matter.

10. There was no testimony, live or otherwise, to contradict Mr. Kseri's statements regarding the price at which wallpaper is sold in the Middle East after the initial sale from a manufacturer to a distributor. Indeed, Mr. Patton admitted to not knowing about the prices at which wallpaper sells in the Middle East at the next step in the chain of commerce.

11. From at least 2009 through the end of 2011, Mr. Kseri aggressively sought to establish a client base in the Middle East. Admitted into evidence are email communications between Mr. Kseri and potential customers in countries such as Iran, Jordan, the United Arab Emirates, Bahrain, and Morocco. For example, the Court notes email correspondence between Mr. Kseri and the following people and/or businesses:

a- Padide Bahraini at Tisser Co in Iran Ex 57

b- Osama Kayyali at Neneh Interiors in Jordan. Ex. 58

c- Shabbir Hasan in the United Arab Emirates. Ex. 60

d- James Prathap at NGC Nafees, discussing a large deal for United Arab Emirates, Qatar, Oman, and Bahrain. Ex. 28

e- The Mowafak Comany in Saudi Arabia. Ex. 29.

f- Souheil Houbbane in Morocco. Ex. 33.

12. The email communications referenced above range from initial inquires about products and prices to more detailed negotiations.

13. Also in evidence are emails between Mr. Kseri and various employees of PWI.

14. Many of these emails support Mr. Kseri's testimony that he was actively building a sales framework in the Middle East. Also highlighted by the emails, however, are the ongoing problems with Mr. Kseri's orders. Mr. Kseri testified that the problems were largely out of his control, and were varied, for instance one order was not honored because the rolls used to the print the wallpaper had been decommissioned, there were delays in introducing new products, and back orders were common.

15. On August 25, 2011, Mr. Patton sent an email to Mr. Kseri indicating that PWI would be limiting the product that PWI would make available to Elite. Ex. 52. The Court ruled in its April 24, 2014 Opinion and Order that this act by PWI constituted a breach of the March 2011 distribution agreement.

16. The record reflects that PWI followed through with Mr. Patton's August 25 email and would not accept orders from Elite for any products that he had not already placed orders for. Mr. Patton's decision prohibited the sale of products to Elite that Mr. Kseri had used as part of his sales pitch over the past twelve to eighteen months in his effort to build a customer base.

17. The Court finds that potential sales relationships, including but not limited to those noted above, were derailed as a result of PWI's breach.

18. Elite's relationship with Asio African, the Egyptian company that Mr. Kseri helped to establish, deteriorated as a result of numerous factors, including PWI's breach and subsequent sales of wallpaper to Asio African, either through DID or directly. The Court has already found, however, that PWI's sale to other entities in the region was not a breach of the March 2011 contract. April 24, 2014 Opinion and Order, p. 14 [Dkt. 48].

19. The record contains email correspondence between Mr. Kseri and PWI personnel after the August 25 email, wherein Mr. Kseri can be seen attempting to either place new orders or inquiring as to the status of orders already placed. Ex. 55, 56, & 62.

20. PWI authorized DID to sell directly into the Middle East, which it had not previously been doing. Ex. 74. The authorization also granted final approval of DID's choice of customer to PWI. *Id.*

21. Mr. Kseri testified, and Mr. Patton confirmed, that Elite's attempt to secure product directly from DID so that he could continue to make sales was rebuffed as a result of the new terms of the PWI-DID contract and Mr. Patton's directions to DID on this point.

22. Testimony established that DID increased its marketing efforts, including setting up a large booth at the annual international wallpaper trade show.

23. DID sales into the Middle East of relevant product during the time remaining on the March 2011 contract after the time of PWI's breach totaled 74,403 rolls of wall covering. Ex. 571. The following is a breakdown of DID Middle East sales from the third quarter of 2001 through February 2014, by collection:

    a- Simply Silks 2: 16,382 rolls

    b- Texture Style: 6,684 rolls

    c- Classic Silks: 10,504 rolls

    d- Black & White: 5,757 rolls

    e- Silk Impressions: 9,360 rolls

    f- Stripes & Damask: 15,108 rolls

    g- Rose Garden: 10,608 rolls

24. Simply Silks 2, Texture Style, and Classic Silks were still available to Elite, per Mr. Patton's August 25 email, however Elite's ability to sell these products was curtailed by the fact that he was placed in position where he could not fully comply with the terms of deals that he was negotiating with prospective customers regarding the new products. This resulted in the further deterioration of Elite's customer relationships. *See* Ex. 58. Compounding this problem is the fact that PWI would not send Elite books of Simply Silk, Texture Style or Classic Silk thereby further limiting Mr. Kseri's ability to market and sell those products. Ex. 56.

25. Mr. Kseri testified that he would have been able to make even more sales than those listed above if it were not for PWI's breach, however Mr. Kseri also testified that his sales efforts were directed at a different segment of the market than DID's sales efforts.

26. The testimony established an average sales price of $15 per roll by Elite. After purchasing product from PWI at, on average, $7.50 per roll, Elite was operating at a 100% markup, with a 50% profit margin.

27. Mr. Kseri's testimony and Elite's tax returns support a finding that Elite spent, on average, $50,000 per year in support of its sales efforts. Ex. 559, 560.

28. The evidence does not support a finding that Elite had successfully established the foundation for a sales network with Indian clients.

### III. CONCLUSIONS OF LAW

As noted above, the Court has already ruled that the August 25, 2011 email constituted a breach of contract by PWI. As a result, this analysis will be focused on Elite's claim for lost profits. This is a challenge for the Court, because, as the facts above show, at the time of the breach Elite was in a position to increase its sales revenue, in part, by

way of the new collections set to be released after the breach. However, as a result of the breach, Elite was unable to reap the benefits of the position that it had worked to attain.

Neither party's arguments on this point are particularly helpful. The facts, contrary to PWI's arguments, do support an award of damages. That being said, other than the lack of a denial by Mr. Patton on this point, nothing in the record suggests that Elite would have made the $250,000 per year for the duration of the March 2011 contract that Elite is seeking.

There are two competing threads in Michigan's law for the award of lost profits. Michigan courts have sought to balance the right of recovery against the prohibition against conjecture and speculation in fact-finding. In striking that balance, the Michigan Court of Appeals has noted that:

> For a plaintiff to be entitled to damages for lost profits, the losses must be subject to a reasonable degree of certainty and cannot be based solely on mere conjecture or speculation; however, mathematical certainty is not required, and even where lost profits are difficult to calculate and are speculative to some degree, they are still allowed as a loss item. *Lorenz Supply Co. v. American Standard, Inc.*, 100 Mich.App. 600, 612, 300 N.W.2d 335 (1980), aff'd. 419 Mich. 610, 358 N.W.2d 845 (1984). The type of uncertainty which will bar recovery of damages is "uncertainty as to the fact of the damage and not as to its amount ... [since] where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery." *Wolverine Upholstery Co. v. Ammerman*, 1 Mich.App. 235, 244, 135 N.W.2d 572 (1965), quoting 15 Am Jur, Damages, § 23, pp 414–416. As early as 1863, the Supreme Court clarified that
>
>> The law does not require impossibilities; and can not, therefore, require a higher degree of certainty than the nature of the case admits. And we can see no good reason for requiring any higher degree of certainty in respect to the amount of damages, than in respect to any other branch of the cause. Juries are allowed to act upon probable and inferential, as well as direct and positive proof. And when, from the nature of the case, the amount of the damages can not be estimated with certainty, or only a part of them can be so ascertained, we

> can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit.
>
> *Allison v. Chandler*, 11 Mich. 542, 554–555 (1863), quoted with approval in *Muskegon Agency, Inc. v. General Telephone Co. of Mich.*, 350 Mich. 41, 50–51, 85 N.W.2d 170 (1957).

*Bonelli v. Volkswagen of Am., Inc.*, 421 N.W.2d 213, 226 (Mich. Ct. App. 1988).

Furthermore, the Michigan Court of Appeals specifically acknowledged the fact that some situations will require estimations of damages, and the law does not preclude an award based solely on that fact. *See Body Rustproofing, Inc. v. Michigan Bell Tel. Co.*, 385 N.W.2d 797, 800 (Mich. Ct. App. 1986) (stating that "when the nature of a case permits only an estimation of damages or a part of the damages with certainty, it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount.").

In a more recent, unpublished decision, the Michigan Court of Appeals parsed a plaintiff's evidence, finding that, while it occupied the ground somewhere between an algebraic certainty and complete speculation, the evidence was sufficient to support an award of damages. *Bero Motors, Inc. v. Gen. Motors Corp.*, 257675, 2006 WL 2312182 (Mich. Ct. App. Aug. 10, 2006). *Bero Motors* is particularly useful in this analysis because it highlights an aspect of the speculation analysis that is relevant to the data before the Court. That is, in *Bero Motors* the Michigan Court of Appeals found that using sales data of competitors or from other markets was acceptable in making a final determination on damages, so long as the sales data used was not itself speculative. *Bero Motors, Inc.,* 2006

WL 2312182 at *8. Armed with such data, the fact-finder is tasked with weighing its credibility and persuasiveness in reaching a final award. *Id.*

In this case, "it is certain that damage has resulted [from PWI's breach]" and the Court will not allow "mere uncertainty as to the amount [to] preclude the right of recovery." *Bonelli*, 421 N.W.2d at 226. The Court will base its damages calculation on the sales record of DID for the contract period in the relevant regions of the relevant products. This data is not speculative; it is up to the Court, as the fact finder, to weigh its applicability. Additionally, the Court has before it a record that supports a finding that Mr. Kseri worked to build a nascent sales network in the Middle East. There is also undisputed evidence that DID was increasing its marketing efforts, which would have aided Mr. Kseri's sales efforts had the relationship between PWI and Elite not soured as it did.

While the record reflects that Elite and PWI did conduct limited business after the August 25 email, the Court is of the opinion that Elite's eventual total cessation of Norwall brand sales was a result of PWI's breach. That is, while PWI in theory agreed to continue to service Elite's older products, the act of cutting off the new products predictably resulted in Elite's customers losing interest and taking their business elsewhere, thereby destroying Elite's ability to sell even the older products. Further compounding Elite's problems, PWI refused to provide it with sales books on all but two of the older lines.

PWI's claims that Elite only sold texture products is undermined by an email from Mr. Kseri to a PWI employee stating that the Damask wall paper - a non-texture style - was one of the most in demand styles in the region. This assertion by Mr. Kseri is borne out by DID's sales numbers for the Stripes & Damask line, which was the second highest selling product during the contract term.

In comparing the volume of sales that DID made with those that Elite could have made, the Court finds that for every sale made by DID, Elite had a 66.6667% chance of benefitting from that sale.[2] That is, because DID and Elite sell to different segments of the wallpaper industry, comparing their sales on a one-to-one basis is of limited utility. The Court is therefore constructing a analytical framework within which Elite was still able to freely place orders with PWI or DID for Norwall brand product for sale in the Middle East, as it was entitled to do under its contract. Under that construct, the Court finds that, if Elite was still operating optimally, it would have had a two-thirds chance of being the buyer for every sale that DID made into the Middle East and then turning around and successfully reselling the product at the $15 average sales price. Informing the Court's analysis on this point is the fact of Elite's pre-existing position within the PWI-DID universe. That is, all other things being equal, it more likely than not, although not a certainty, that when PWI and/or DID sought to make sales in the Middle East, Elite would have been the first entity approached regarding the sale. Elite also appears to have been constantly attempting to open up new sales territory within the region, and as such, would likely have been the business responsible for the bulk of the sales into the region. Also factoring in to this determination is the fact that DID's marketing efforts could only have helped Elite's sales, as its potential clients would have been more likely to know about and want the product that

---

[2] Admittedly, there is no hard data in the record that would allow the Court to calculate Plaintiff's odds of making a sale, however, taking into account all of the testimony and evidence presented during the trial, the Court is of the opinion that allocating a two-thirds probability in this case strikes a fair balance between Plaintiff's sales ability and local knowledge, and DID's sheer size.

11

Elite could have been selling as a result of DID's efforts to increase Norwall's global brand visibility.

Furthermore, the facts establish that Elite was operating a business with, on average, a 50% profit margin, and $50,000 in fixed annual costs.

As to the Indian market, the evidence does not support a finding that Mr. Kseri had even the beginnings of a foothold in India, and no damages will be awarded for that market.

As to PWI's claims that Elite failed to mitigate its damages, the record does not support such a finding. Immediately after receiving the August 25 email, Mr. Kseri scrambled to limit his exposure. Indeed, PWI went so far as to accuse Mr. Kseri of attempting to cut it out of a failed deal with DID, which is, if nothing else, a clear attempt at mitigation. Additionally, Elite's ability to mitigate by selling other brands of wall covering, such as Blue Mountain, was something of an illusion, as Mr. Kseri's testimony established that his arrangement with Blue Mountain was only for children's products adorned with super hero and cartoon character designs. Such a product necessarily has a limited customer base.

The Court therefore finds that Elite has met its burden in establishing the facts necessary to support an award of damages for lost profits resulting from PWI's breach of the March 2011 contract. The damages calculations follow.

## IV. DAMAGES

In light of the above findings, the Court calculates Elite's damages as follows:

74,493 rolls of wall paper sold by DID in the region at Elite's $15 average sales price, with a 50% profit margin and 66.6667% sales probability is $372,465.18. Taking into

account Elite's average annual fixed costs over the three year term of the contract ($150,000.00), the final damages amount for Elite's lost profits is $222,465.18.

## V.     CONCLUSION

For the reasons set forth above, the Court AWARDS Plaintiff Elite International Enterprise, Inc. $222,465.01 in damages for its lost profits as a result of Defendant Patton Wallcoverings Inc.'s breach of contract. A judgment in the aforementioned amount shall be entered forthwith.

SO ORDERED.

                                        s/Nancy G. Edmunds
                                        Nancy G. Edmunds
                                        United States District Judge

Dated:  September 2, 2014


I hereby certify that a copy of the foregoing document was served upon counsel of record on September 2, 2014, by electronic and/or ordinary mail.

                                        s/Carol J. Bethel
                                        Case Manager